UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PETER J. MCDANIELS,

                                Plaintiff,

        v.

KATHLEEN PREITO, et al.,

                                Defendants.

CASE NO. 3:17-cv-05801-RBL-DWC

REPORT AND RECOMMENDATION

Noting Date: March 29, 2019

The District Court has referred this action, filed pursuant to 42 U.S.C. § 1983, to United States Magistrate Judge David W. Christel. Plaintiff Peter J. McDaniels, proceeding *pro se* and *in forma pauperis*, initiated this civil rights action on October 4, 2017. Dkt. 1.

Plaintiff alleges six claims for retaliation in violation of his First Amendment rights. Plaintiff alleges his privileges were revoked, additional policies were instituted, he was verbally assaulted, he received an "observation report," he received an infraction, and he was ultimately terminated from his prison job, all in retaliation for allegedly protected speech. He also alleges one claim for violation of his equal protection rights because other prisoners with similar

1  criminal histories were allowed to maintain their jobs while he was terminated. Finally, he

2  alleges violations of 42 U.S.C. § 1985 and § 1986 for "conspiracy and neglect".

3        However, Plaintiff has not provided evidence Defendants acted with retaliatory motive

4  when they engaged in the alleged conduct, has not shown that any of the allegedly retaliatory

5  actions did not reasonably advance a legitimate correctional goal, and has not shown some of his

6  speech was, in fact, protected conduct. Further, he has not shown he was treated differently from

7  others similarly situated to support a claim that his equal protection rights were violated, nor has

8  he shown Defendants conspired to deprive him of his rights under § 1985 or § 1986. Therefore,

9  the Court recommends Defendants' Motion for Summary Judgment ("Motion") (Dkt. 47) be

10  granted and Plaintiff's claims be dismissed.

11  **I.      Background**

12        Plaintiff initiated this civil rights action on October 4, 2017. Dkt. 1. All Plaintiff's

13  allegations relate to a prison job he held while incarcerated. It is undisputed that, at all relevant

14  times, Plaintiff was a prisoner at the Stafford Creek Corrections Center ("SCCC") and worked in

15  the "clerk pool" from September 2013 to November 2014. *See* Dkt. 53, McCormick Decl., ¶ 3.

16  During the time Plaintiff worked in the clerk pool, the clerk pool was located in "T-Building," a

17  building on SCCC's campus. *See* Dkt. 48, Prieto Decl., ¶ 4. Plaintiff alleges, when he was

18  working in the clerk pool: (1) Defendants Prieto and McCormick retaliated against him when

19  they revoked clerk pool privileges and increased pat searches on him after he complained about a

20  file cabinet placed near his workspace; (2) Defendants Prieto and McCormick retaliated against

21  him when a policy requiring that prisoners be escorted in T-Building was implemented after

22  Plaintiff made verbal complaints about and submitted written grievances regarding a policy

23  requiring him to inform Defendant Prieto before he went to the bathroom; (3) Defendants Prieto

24

1    and McCormick retaliated against him when they confronted him about not being escorted after

2    he went to the grievance coordinator's office and complained about the bathroom policy; (4)

3    Defendants Prieto and McCormick retaliated against him when they "made up a bogus

4    Observation Report" following the encounter they had with him the previous day; (5) Defendants

5    Prieto and McCormick retaliated against Plaintiff when they infracted him and threatened to fire

6    him from his job after he refused to sign the "Observation Report"; and (6) Defendants Prieto,

7    McCormick, and Bohon all retaliated against Plaintiff when they terminated him from his clerk

8    pool job because he "complained, spoke out, and grieved the bogus infraction, refused to sign the

9    bogus infraction, wrote grievances, and complained in person about the bogus infraction, the

10   restroom policy and being punished with a filing cabinet at his back [in his work space]". Dkt. 4-

11   1, ¶¶ 48-53.

12       He also alleges his equal protection rights were violated because he was allegedly

13   terminated from his clerk pool job because of his criminal background, yet other prisoners with

14   similar or even more egregious criminal backgrounds were allowed to retain the same position.

15   Dkt. 4-1, ¶ 54. He finally alleges Defendants violated 42 U.S.C. §§ 1985 and 1986 because they

16   engaged in a conspiracy to deprive Plaintiff of his rights. *Id*.

17       On October 12, 2018, Defendants filed their Motion, arguing Plaintiff had failed to

18   provide evidence showing retaliatory motive and failed to show the actions allegedly taken

19   against Plaintiff did not reasonably advance a legitimate correctional goal. Dkt. 47. Defendants

20   submitted Declarations from Defendant Prieto, Non-Party Atkinson née Ross (hereinafter "Non-

21   Party Ross"),[1] Defendant Bohon, Non-Party Caldwell, Non-Party Jones, Defendant McCormick,

22   _____

23       [1] Though Non-Party Ross's last name has changed, the parties consistently refer to her as "Ross" in both
     Plaintiff's Complaint and Defendants' Motion. *See* Dkts. 4, 47. The Court will do the same, but will refer to her
24   declaration as "Atkinson Declaration," as that is how the declaration is titled on the docket.

and Non-Party Brown. Dkts. 48-54. Plaintiff filed a motion for extension of time to respond to Defendants' Motion, Dkt. 57, which the Court granted. Dkt. 61. Plaintiff then filed his Response, including two of his own declarations. Dkts. 62-64. Plaintiff also filed a Motion for Leave to File Excess Pages, requesting the Court grant him leave to file excess pages in his Response, which the Court granted. Dkts. 65, 68. Defendants filed a Reply. Dkt. 67.

## II.    Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party asserting a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). All facts and reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (*citing Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

As the party moving for summary judgment, Defendants have the initial burden to demonstrate no genuine issue of material fact remains in this case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying those portions of the record, including pleadings, discovery materials, and affidavits, "which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323. Mere disagreement or the bald assertion stating a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290); *see also California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3).

### III. Discussion

#### A. Retaliation

Plaintiff raises six claims against Defendants arguing they retaliated against him because he engaged in protected speech. To prevail on a retaliation claim, a plaintiff must prove the defendant retaliated against him for exercising a constitutional right and the retaliatory action did

not advance legitimate penological goals or was not narrowly tailored to achieve such goals. *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997). A prisoner suing a prison official under § 1983 for retaliation must show "the type of activity he engaged in was protected under the first amendment and that the state impermissibly infringed on his right to engage in the protected activity." *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1983).

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

First, the Ninth Circuit has noted the "mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (emphasis in original). Second, to determine whether a defendant's actions were "because of" a prisoner's protected conduct, the Court may examine either direct or circumstantial evidence, including the timing of the alleged adverse action, a defendant's expressed opposition to Plaintiff's speech, or "other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual." *McCollum v. California Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)). However, Plaintiff must show his protected conduct was a "substantial" or "motivating" factor behind the defendants' challenged conduct. *Brodheim*, 584 F.3d at 1269, 1271. Timing alone is not sufficient to demonstrate causation. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Further, under *Wood v. Yordy*, "[m]ere speculation that defendants acted out of retaliation is not sufficient." 753 F.3d 899, 905 (9th Cir. 2014). In that case, a prisoner alleged prison officials were retaliating against him for winning on an appeal, and produced evidence of isolated statements of dislike from prison staff and a memo

stating "we cannot make it appear that an inmate can win." *Id*. at 901, 904. The Ninth Circuit held even that much evidence did not raise the prisoner's claims above the speculative level. *Id*. at 905.

Third, Plaintiff must show that the conduct against which Defendants allegedly retaliated was, in fact, protected conduct. *See Brodheim*, 584 F.3d at 1269. Failure to allege Plaintiff was engaging in protected conduct is fatal to a retaliation claim. *See Brennan v. Aston*, 2018 WL 3406948, at *4-*5 (W.D. Wash. June 14, 2018) *report and recommendation adopted* 2018 WL 3388926 (finding failure to allege a prisoner was engaging in protected conduct is fatal to the prisoner's retaliation claim).

Fourth, Plaintiff need not demonstrate the adverse action actually chilled his ability to engage in protected conduct because "[t]o hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568-59). However, Plaintiff must show the adverse action "'would chill *or* silence a person of ordinary firmness from future First amendment activities.'" *Id*. (quoting *Rhodes*, 408 F.3d at 168-69) (emphasis in original). Finally, Plaintiff must show the challenged action "'did not reasonably advance a legitimate correctional goal.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhode*, 408 F.3d at 568).

In addition, when evaluating a retaliation claim, the Court is required to "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt*, 65 F.3d at 807 (quoting *Sandin*, 515 U.S. 472, 482 (1995)). "Security, of course, is the paramount concern of prison administrators. As the Supreme Court has noted: 'The essence of a correctional counselor's job

is to maintain prison security.'" *Teamsters Local Union No. 117 v. Washington Dep't of Corrections*, 789 F.3d 979, 990 (9th Cir. 2015) (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 335 (1977)). Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, Plaintiff has raised six separate retaliation claims.

### 1. First Retaliation Claim

Plaintiff claims Defendants Prieto and McCormick retaliated against him when they revoked clerk pool privileges and increased pat searches on him after he complained about a file cabinet placed near his workspace. Dkt. 4-1, ¶ 48. He alleges that Defendants Prieto and McCormick in response to his complaints denied Plaintiff and other prisoner workers in the clerk pool a radio, instituted additional pat searches, forbade prisoner workers from bringing books into the work space, and revoked paid time off for prisoner workers. *Id*. He states the pat searches in particular "would have been appropriate if it weren't for suspect timing." *Id*.

### a. Evidence

In Plaintiff's verified Complaint,[2] Plaintiff states he complained about a file cabinet that "was placed about eighteen inches behind [his] chair, so [he] had to squeeze into [his] spot where [he] worked . . . ." Dkt. 4-1, ¶ 16. He states "[t]he furniture rearranging . . . was actually [Defendant Prieto] retaliating against [Plaintiff] for openly complaining about the fact that [he] was actually now required to tell defendant Prieto, face to face in her office, every time [he] went

---

[2] Because Plaintiff's verified Complaint was signed under penalty of perjury, the Court considers it as an opposing affidavit, and therefore evidence, for summary judgment purposes. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

1    to the bathroom." *Id*. at ¶ 17. After Plaintiff complained about the file cabinet and the cabinet

2    was moved, Plaintiff states several privileges were taken away in retaliation for his complaints,

3    including the clerk pool radio, additional pat searches, a requirement that clerk pool workers

4    could no longer bring books to work, and retraction of paid time off. *Id*. at ¶ 18. He states

5    "[b]ecause of [his] complaining . . . the retaliation and loss of privileges came in the form of a

6    retaliation spree." Dkt. 4, ¶ 18. He does not further describe how he knows the alleged action

7    were in response to his complaints.

8         Plaintiff has also included testimony in his Response, signed under penalty of perjury,

9    that "Prieto and McCormick retaliated by taking away several longstanding privileges," and that

10   the privileges were taken away "because the plaintiff was exercising his right to redress his

11   grievances about and through his government: [sic] protected conduct." Dkt. 63, First McDaniels

12   Decl., p. 4.

13        Plaintiff includes testimony in his second declaration stating privileges were taken away

14   "as a direct result of [his] complaints about the creepy toilet use policy and the filing cabinet

15   retaliation." Dkt. 64, p. 5. Plaintiff attributes these actions to both Defendant Preito and

16   Defendant McCormick, but does not provide further description of how he had personal

17   knowledge the alleged actions were in retaliation for his protected conduct, instead arguing the

18   sequence of events demonstrates retaliatory motive. Dkt. 4-1, ¶ 48; Dkt. 53, McCormick Decl., ¶

19   9.

20        Defendants do not dispute that a file cabinet was moved behind Plaintiff's work space in

21   the clerk pool. Dkt. 53, McCormick Decl., ¶ 8. However, it is disputed whether the file cabinet

22   was in place for one day or for several days. Dkt. 53, McCormick Decl., ¶ 8; Dkt. 64, Second

23   McDaniels Decl., pp. 4-5.

24

1    It is disputed whether the clerk pool radio was ever removed from the clerk pool. Dkt. 4-

2    1, ¶¶ 18, 48; Dkt. 53, McCormick Decl., ¶ 9. It is also disputed whether prisoner workers were

3    ever allowed paid time off, let alone whether that privilege was revoked. Dkt. 53, McCormick

4    Decl., ¶ 9; Dkt. 64, Second McDaniels Decl., p. 6.

5    The parties do not dispute prisoners were subject to pat searches. However, the manner of

6    the pat searches is disputed. Plaintiff states the pat searches began in retaliation for his

7    complaints and they were instituted arbitrarily. *See* Dkt. 64, Second McDaniels Decl., p. 5.

8    Defendants, however, have provided evidence prisoners were all pat searched upon leaving and

9    entering T-Building. Dkt. 48, Prieto Decl., ¶ 13. Defendants have also provided evidence the

10   decision to institute pat searches was "not made solely by [Defendant] McCormick or

11   [Defendant Prieto] but by the entire staff within T-Building." *Id*. The proffered reason for the

12   additional pat searches was T-Building staff noticed some prisoners arriving for disciplinary

13   hearings were agitated, "a concern that was exaggerated by the small size of T-Building." *Id*.

14   b. Analysis

15   Here, Plaintiff has not sufficiently supported his claim that Defendants Prieto and

16   McCormick removed Plaintiff's privileges in retaliation or increased pat searches for Plaintiff

17   complaining about the filing cabinet. Plaintiff has included allegations in his verified Complaint,

18   as well as in his two declarations, indicating he believes the revocation of his privileges was

19   based on retaliation. For example, he states "[b]ecause of [his] complaining . . . the retaliation

20   and loss of privileges came in the form of a retaliation spree." Dkt. 4, ¶ 18. In another instance,

21   Plaintiff states the alleged actions were "because the plaintiff was exercising his right to redress

22

23

24

his grievances." Dkt. 63, First McDaniels Decl, p. 4. In yet another instance, Plaintiff states the actions were "a direct result of [his] complaints." Dkt. 64, p. 5.

However, Plaintiff's testimony stating Defendants' alleged actions were retaliatory amounts only to conclusory statements, based on Plaintiff's suspicion rather than personal knowledge or direct or circumstantial evidence. He speculates that, because the privileges were allegedly revoked after he complained about the filing cabinet, Defendants' actions were based on that complaint. "Purported evidence that 'sets out mere speculation for the critical facts, without a showing of foundation in personal knowledge, for the facts claimed to be at issue' is insufficient." *Savin v. Savin*, 2015 WL 3619184, at *6 (C.D. Cal. May 5, 2015) (quoting *John v. Floyed & Assoc., Inc. v. Tapco Credit Union*, 550 Fed. App'x 359, 360 (9th Cir. 2013)); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 n.9 (9th Cir. 2011) (en banc) (conclusory statements are insufficient to defeat summary judgment). Though Plaintiff has submitted a substantial amount of testimony and other documents, his evidence regarding the causation of the alleged revocation of privileges amounts only to Plaintiff's own suspicions. *See Hicks v. Dotson*, 73 F. Supp. 3d 1296, 1305 (E.D. Wash. Dec. 22, 2014) ("Plaintiff's suspicions are not sufficient to establish genuine issue of material fact warranting his claims to proceed to trial") (citing *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

In addition, Plaintiff's argument Defendants retaliated against him for complaining about the file cabinet is partially based on "suspect timing." Dkt. 4, ¶ 48. Plaintiff has submitted evidence his privileges were revoked "as a direct result of [his] complaints about the creepy toilet policy and the filing cabinet retaliation." Dkt. 64, pp. 5-6. Plaintiff's evidence indicates he and the rest of the workers in the clerk pool lost privileges after Plaintiff complained to

1    Defendants Prieto and McCormick. He states in his Complaint the pat searches "would have

2    been appropriate if it weren't for suspect timing." Dkt. 4-1, ¶ 48. However, Plaintiff must

3    provide more than evidence of allegedly suspect timing in order to support his claims that

4    Defendants acted *because of* Plaintiff engaging in protected conduct. *Pratt*, 65 F.3d at 808.

5    Insofar as Plaintiff relies on the timing of the alleged actions, Plaintiff must provide more to

6    survive summary judgment. *See*, *e.g.*, *Ventress v. Castillo*, 2018 WL 4492960, at *3-*4 (W.D.

7    Wash. Aug. 23, 2018) (noting timing alone is generally not sufficient to establish retaliation, and

8    failure to provide actual evidence of retaliation warrants dismissal at the summary judgment

9    stage); *Hicks*, 73 F. Supp. 3d at 1303-04 (finding summary judgment was appropriate where a

10    plaintiff "offered no evidence of Defendant's intention beyond the timeline of events . . .").

11        Therefore, the Court finds Plaintiff has not shown Defendants Prieto and McCormick

12    revoked any privileges or increased pat searches because of Plaintiff's allegedly protected

13    conduct. Accordingly, the Court recommends Defendants' Motion (Dkt. 47) be granted as to

14    Plaintiff's first retaliation claim.

15        *2.  Second Retaliation Claim*

16        Plaintiff claims Defendants Prieto and McCormick retaliated against him when a policy

17    requiring that prisoners be escorted in T-Building was implemented after Plaintiff made verbal

18    complaints about and submitted written grievances regarding a policy requiring him to inform

19    Defendant Prieto before he went to the bathroom. Dkt. 4, ¶ 49. Plaintiff states the "new escort

20    policy is directly related to that grievance [he] made and the verbal complaining [he] made"

21    against the rule requiring him to contact Defendant Prieto before using the restroom. *Id.*

22        a.  Evidence

23

24

1    It is undisputed that prisoners were required to be escorted by an officer when entering T-

2  Building. *See* Dkt. 48, Prieto Decl., ¶ 15; Dkt. 53, McCormick Decl., ¶ 10. There is a red line

3  near the entrance to T-Building that prisoners are required to wait behind until an officer arrives

4  to escort the prisoner or prisoners to their destination. *Id*. All prisoners entering T-Building were

5  required to adhere to this policy. *Id*. Defendants have provided evidence this policy was in place

6  due to safety concerns. Dkt. 48, Prieto Decl., ¶ 15. Defendants have provided evidence T-

7  Building is a small administration building with only one security staff member assigned to the

8  building as a hearings officer, and the hearings officer is not always present in the building. Dkt.

9  49, Atkinson Decl., ¶ 4. Defendants' evidence indicates T-Building is staffed only by non-

10  custody officers, who are not trained to have hands-on contact with prisoners. *Id*. The evidence

11  also shows a Department of Corrections ("DOC") staff member at the Monroe Correctional

12  Complex was murdered by an offender in 2011, and since that time, no staff member has been

13  allowed to be alone with a prisoner. Dkt. 48, Prieto Decl., ¶ 15.

14    Plaintiff's verified Complaint states he believes that "according to the timeline" the escort

15  policy was implemented in retaliation for Plaintiff's filing of a grievance. Dkt. 4-1, ¶ 49.

16    b.   Analysis

17    Here, even if Plaintiff is able to show Defendants Prieto and McCormick implemented a

18  policy requiring prisoners to be escorted in T-Building and assuming such a policy constitutes

19  adverse action, Plaintiff has failed to provide evidence that such a policy did not reasonably

20  advance a legitimate correctional goal. Defendants argue the policy was based on safety and

21  security concerns. *See* Dkt. 47, pp. 17-18. Defendants have provided evidence the policy

22  addresses these concerns because of how small T-Building is, how few staff it has, and because

23  of the requirement that prison staff not be left alone with prisoners. *See* Dkt. 48, Prieto Decl., ¶

24

15; Dkt. 49, Atkinson Decl., ¶ 4. It also addresses the fact that T-Building is staffed by non-custody officers who have not been trained to have hands on contact should a prisoner lose control. Dkt. 49, Atkinson Decl., ¶ 4. The evidence indicates the policy applied to all prisoners, not just to Plaintiff. Dkt. 48, Prieto Decl., ¶ 15; Dkt. 53, McCormick Decl., ¶ 10. Plaintiff does not explain how implementing a policy that requires all prisoners to be escorted by an officer when going to their desks does not advance a reasonable correctional goal by advancing the safety and security of the prison.

As noted above, security is not just a reasonable correction goal, it is the paramount concern of prison administrators. *Teamsters Local Union No. 117*, 789 F.3d at 990. "[E]vidence that defendant's challenged conduct was motivated by a legitimate correctional goal will defeat a retaliation claim." *Garcia v. Blahnik*, 2017 WL 1226863, at *22 (S.D. Cal. Feb. 3, 2017) (citing *Barnett v. Centoni*, 31 F.3d at 813, 816 (9th Cir. 1994)). The Court finds Defendants have provided evidence the policy requiring prisoners to be escorted in T-Building reasonably advanced the legitimate correctional goal of assuring the safety and security of the facility. The Court also finds the undisputed evidence indicates all prisoners, not just Plaintiff, were required to adhere to that policy. The Court further finds Plaintiff's evidence on the record does not rebut Defendants showing that the escort policy reasonably advanced a legitimate correctional goal.

Therefore, Plaintiff has failed to adequately show the implementation of the policy requiring escorts in T-Building did not reasonably advance a legitimate correctional goal. Accordingly, the Court recommends Defendants Motion (Dkt. 47) be granted as to Plaintiff's second retaliation claim.

     *3.  Third Retaliation Claim*

1     Plaintiff claims Defendants Prieto and McCormick retaliated against him when they

2   confronted him about not being escorted after he went to the grievance coordinator's office and

3   complained about the bathroom policy. Dkt. 4-1, ¶ 50. He states they did so in retaliation when

4   he complained about the "restroom policy" by "changing the escort policy again, verbally

5   attacking [him,] and goading [him]" in an attempt to elicit a physical altercation and for

6   discussing the "restroom policy" with the grievance coordinator.  *Id.* However, Plaintiff does not

7   provide additional description as to how that discussion motivated Defendant Prieto's and

8   Defendant McCormick's actions. *Id.*

9     a.   Evidence

10     Plaintiff's verified Complaint states on an unknown date, Plaintiff returned to the Clerk's

11   pool and Defendant Prieto began berating him for non-compliance with the policy requiring

12   prisoners to be escorted when they come into T-Building. Dkt. 4-1, ¶ 29. Plaintiff states

13   Defendant Preito then arbitrarily changed the escort policy, requiring Plaintiff to have a staff

14   member go back and retrieve either Defendant Prieto or Defendant McCormick rather than being

15   escorted in. Dkt. 4-1, ¶ 29. He states when he tried to explain himself, Defendant McCormick

16   came out of her office, told Plaintiff to "stop back talking," and both Defendants Prieto and

17   McCormick "kept goading [him] into a fight." *Id.* at ¶ 30. He has included testimony that

18   Defendant McCormick only began enforcing the requirement that Plaintiff be escorted after he

19   "started complaining about the conditions of the Clerk Pool." Dkt. 64, Second McDaniels Decl.,

20   p. 9. Plaintiff has also included a statement in his Response, signed under penalty of perjury, that

21   "the plaintiff was verbally assaulted along with attempts to get the plaintiff to enter into a

22   physical altercation with him by Prieto and McCormick . . . ." DKt. 63, p. 5. He states their

23

24

1    verbal attacks were in retaliation for Plaintiff "going to the grievance coordinator's office and

2    complaining about the restroom policy." Dkt. 4-1, ¶ 50.

3            Defendants have submitted evidence that on or about November 13, 2014, Plaintiff

4    returned to the Clerk's pool and Defendants Prieto and McCormick did not observe him with an

5    escort. Dkt. 48, Prieto Decl., ¶ 16; Dkt. 53, McCormick Decl., ¶ 10. The evidence indicates

6    Plaintiff claimed he had been escorted by an officer, but neither Defendant Prieto nor Defendant

7    McCormick saw the officer. *Id*. Defendants' evidence indicates Defendants Prieto and

8    McCormick confronted Plaintiff about not following the rules requiring he be escorted, but

9    Plaintiff would not listen. *Id*. Defendant Prieto states that, because it appeared officers were not

10   properly escorting the prisoners, they would have to change the policy and be informed when a

11   prisoner needed to be escorted back. Dkt. 48, Prieto Decl., ¶ 16. Defendants' evidence

12   contradicts Plaintiff's evidence, indicating throughout the encounter it was Plaintiff who began

13   raising his voice and it was Plaintiff who would not listen to Defendant Prieto or Defendant

14   McCormick when Plaintiff was confronted about not having an escort. Dkt. 48, Prieto Decl., ¶

15   16; Dkt. 53, McCormick Decl., ¶ 10.

16           b.   Analysis

17           Here, even reading the facts in the light most favorable to Plaintiff, Plaintiff has not

18   established Defendant Prieto's and Defendant McCormick's alleged actions were motivated by

19   Plaintiff's protected conduct. Even taking Plaintiff's version of events as true, Plaintiff has only

20   provided his own speculation that the encounter was motivated by retaliation against Plaintiff's

21   conversation with the grievance coordinator. For example, he states without elaboration he was

22   verbally assaulted in retaliation "for going to the grievance coordinator's office . . . ." Dkt. 4-1, ¶

23   50. Elsewhere in the record, he describes being verbally assaulted by Defendant Prieto and

24

McCormick, but does not include a description of their motivations for doing so. *See* Dkt. 63, pp. 5-6. Similarly, Plaintiff alleges Defendants Prieto and McCormick "bum rushed" him after being escorted back to the clerk pool, but again does not describe their motivations. Dkt. 64, Second McDaniels Decl., p. 8. A conclusory statement that a Defendant was motivated by retaliation, without more, is not actual evidence on the record that supports Plaintiff's claim. *See Fannin v. Smith*, 2015 WL 1885683, at *7 (E.D. Wash. April 24, 2015) ("It is Plaintiff's burden to produce sufficient evidence for a reasonable jury to conclude that it is more likely than not that Defendants acted with a substantial or motivating factor to retaliate against Plaintiff").

The Court may also take into consideration the timing of events when considering whether a Defendant acted with retaliatory motive. *McCollum*, 647 F.3d at 882. Plaintiff's allegations state Defendant Prieto and Defendants McCormick confronted him after he complained to the grievance coordinator about the restroom policy. However, he does not provide evidence Defendant Prieto or Defendant McCormick knew about Plaintiff's conversation with the grievance coordinator when they allegedly verbally assaulted him or that the grievance was the "substantial" or "motivating" factor behind their actions. The Court finds, on the record before it, a reasonable juror could not conclude Defendants Prieto and McCormick's actions, even taken in the light most favorable to Plaintiff, were motivated by retaliation against Plaintiff's protected conduct. *See Guerrero v. McClure*, 2013 WL 753305, at *11 (E.D. Cal. Feb. 27, 2013) ("[A] mere allegation of retaliatory motive is insufficient to defeat a motion for summary judgment").

Therefore, Plaintiff has failed to show Defendants Prieto and McCormick retaliated against Plaintiff when they confronted him about not being escorted. Accordingly, the Court recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's third retaliation claim.

### 4. Fourth Retaliation Claim

Plaintiff claims Defendants Prieto and McCormick retaliated against him when they "made up a bogus Observation Report" following the encounter they had with him the previous day. Dkt. 4, ¶ 51. He claims he was "reprimanded violently" for "back-talking," and the "bogus Observation Report" misstated the situation. *Id.*

### a. Evidence

In Plaintiff's verified Complaint, Plaintiff states the day after the altercation described in his third retaliation claim, section III(A)(3) *supra*, Plaintiff again met with Defendant McCormick. Dkt. 4-1, ¶ 31. Plaintiff states Defendant McCormick produced a slip of paper "agreeing that [Plaintiff] had broken the rules the previous day, and that [he] would not do it again." *Id.* Plaintiff disagreed with the characterization of the interaction, and so refused to sign the paper. *Id.* Plaintiff states Defendant McCormick would "not let [him] leave unless [he] signed the 'guilty as charged' strip of paper." *Id.* at ¶ 32. Because Plaintiff was not allowed to leave until he signed the document, Plaintiff instead requested he be allowed to retrieve the prison chaplain. *Id.* Once the chaplain was present, Plaintiff states "McCormick threatened to fire [him] if he didn't sign," though also assured Plaintiff he "was not going to receive an infraction." *Id.* at ¶ 33. Plaintiff stated he had a right not to sign the document, and that he planned to file a grievance about the issue. *Id.* Plaintiff describes the interaction as heated, stating Defendant McCormick and Defendant Prieto both raised their voices while Plaintiff attempted to remain calm. *Id.* at ¶¶ 32-34.

Plaintiff has also provided evidence he submitted a grievance indicating he believed he had a right not to sign the Observation Report. Dkt. 62, p. 93. In addition, the response to that grievance, made by Non-Party McTarsney indicates, "[a]ny offender has the right to choose

1  whether or not to sign a document of any sort." *Id*. On appeal, Non-Party Glebe confirmed this,

2  noting there is no policy that states an offender has the right to refuse to sign documents because

3  "offenders have this right naturally." *Id*. at p. 94.

4      Defendants have submitted evidence confirming Defendant McCormick requested

5  Plaintiff sign an observation report. Dkt. 48, McCormick Decl., ¶ 13. The observation report,

6  dated November 12, 2014 and signed on November 13, 2014, states in its entirety "[Plaintiff] is

7  not to be back in Clerk Pool without us calling him back. Can not [sic] take items in or out of

8  clerk pool. Talked to about this a couple of times. Was arguing with staff." Dkt. 48-1, p. 4.

9  Defendants do not dispute the observation report was in response to the interaction the previous

10 day. Dkt. 53, McCormick Decl., ¶ 13. Defendants also do not dispute Plaintiff refused to sign the

11 observation report, that the chaplain was eventually called, and that the chaplain was ultimately

12 the person to sign the observation report. *Id*.

13      Some of Defendants' evidence contradicts Plaintiff's evidence. Defendant McCormick

14 indicates she and Defendant Prieto attempted to speak calmly with Plaintiff and enlisted the

15 chaplain to help, but Plaintiff continued to raise his voice. Dkt. 53, McCormick Decl., ¶ 13; Dkt.

16 53-1, p. 5. Her statement indicates Plaintiff was "not listening, interrupting, and started yelling at

17 [Defendant] Prieto and me" because he did not agree with the characterization of the incident in

18 the observation report. *Id*. Defendant Prieto's testimony corroborates Defendant McCormick's

19 account. Dkt. 48, Prieto Decl., ¶ 17.

20      b.    Analysis

21      Initially, Plaintiff states the protected speech Defendants Prieto and McCormick allegedly

22 retaliated against was the conversation Plaintiff had with them the previous day. Dkt. 4-1, ¶ 51.

23 He states he has "a protected interest in [his] speech and that includes [his] walking away from

24

1  danger." *Id*. It appears Plaintiff alleges his right to converse with Defendants Prieto and

2  McCormick, as well as his right not to converse with them, is the protected interest against which

3  Defendants allegedly retaliated.

4      A prisoner's right to free speech is more limited than the right of a non-prisoner. Indeed,

5  courts have repeatedly held that not all speech by prisoners is protected by the First Amendment.

6  *See*, *e.g.*, *West v. Dizon*, 2014 WL 794335, at *5-*6 (E.D. Cal. Feb. 27, 2014) (protected speech

7  includes a prisoner's verbal expression of an intent to submit a formal written grievance); *Uribe*

8  *v. McKesson*, 2011 WL 9640, at *12 (E.D. Cal. Jan. 3, 2011) (prisoner's attempt to report a

9  prison official's misconduct, either "verbally or in writing, constitutes speech or conduct entitled

10  to First Amendment protection"); s*ee also McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005)

11  (to support a retaliation claim, a prisoner's speech "must relate to a public concern and not just a

12  personal matter to receive First Amendment protection"). A prisoner can even be punished if

13  their speech interferes with a legitimate penological interest. *See*, *e.g.*, *Griffin v. Berghuis*, 563

14  Fed. App'x 411, 416 (6th Cir. 2014) (speech may be punished if it "is made in a manner

15  incompatible with the institution's legitimate penological objectives"); *Caffey v. Maue*, 679 Fed.

16  App'x 487, 490 (7th Cir. 2017) ("Insubordinate, verbal remarks to prison staff are inconsistent

17  with the status of a prisoner").

18      Plaintiff alleges he was retaliated against based on his interaction with Defendants Prieto

19  and McCormick regarding his failure, or lack thereof, to bring an escort when coming to the

20  clerk pool. It is disputed which party was the aggressor in the encounter between Plaintiff,

21  Defendant Prieto, and Defendant McCormick. Plaintiff has submitted evidence he was calm,

22  whereas Defendants Prieto and McCormick were yelling and losing control. Nonetheless, it is

23  not disputed Defendants Prieto and McCormick asked Plaintiff to sign the observation report

24

because of Plaintiff's interaction with them. However, the right Plaintiff alleges was violated was not that he threatened to file a grievance and was thereafter punished. Rather, it is a "protected interest in [his] speech and that includes my walking away from danger." Dkt. 4-1, ¶ 51. Though a prisoner's right to file grievances is protected by the First Amendment, not all actions involving speech are similarly protected. Verbal interactions between prisoners and prison staff are not, of themselves, rights protected by the First Amendment. *See Johnson v. Carroll*, 2012 WL 2069561, at *34 (E.D. Cal. June 7, 2012) (a prisoner's verbal statements and challenges made to prison staff incident to a challenged strip search fall outside of First Amendment protection and therefore plaintiff failed to state a First Amendment retaliation claim). The Court finds Plaintiff's interaction with Defendant McCormick and Defendant Prieto, when they were discussing Plaintiff's alleged violation of prison rules, is similarly not protected speech. Thus, Plaintiff has not shown Defendants actions were because of Plaintiff engaging in protected speech, and so has not shown Defendants retaliated against him.

Further, it is undisputed Defendants Prieto and McCormick asked Plaintiff to sign an observation report regarding their encounter the previous day. However, the Court does not conclude this constitutes an adverse action against Plaintiff. The record indicates the observation report is not an infraction, not an admission of guilt, and not any other sort of prison disciplinary action. *See* Dkt. 48, Prieto Decl., ¶ 17. Rather, it is a record of behaviors staff notice to be problematic and may need to correct in the future. *Id*. Though Plaintiff alleges the observation report was "bogus," the record nonetheless indicates Defendants Prieto and McCormick wrote the observation report after an incident they found problematic. *Id*. Whether or not Plaintiff was behaving in a belligerent manner is disputed. But it is not disputed the observation report had no disciplinary consequences even if Plaintiff signed it.

1    Thus, the undisputed facts indicate the action Defendants Prieto and McCormick

2    allegedly took against Plaintiff was to ask him to sign an observation report he did not agree with

3    – an observation report that did not have immediate consequences other than cataloguing

4    Plaintiff's alleged behavior. The Court does not conclude this constitutes an adverse action. *See*

5    *Samano v. Copeland*, 2008 WL 2168884, at *2 (E.D. Cal. May 23, 2008) (finding the issuance of

6    two informational "counseling chronos" did not "constitute adverse action sufficient to give rise

7    to a claim for violation of the Constitution"). Though Plaintiff also includes evidence that

8    Defendants Prieto and McCormick allegedly threatened Plaintiff if he would not sign the

9    observation report, that is not the issue he has raised in his fourth retaliation claim. *See Updike v.*

10   *Multnomah C'nty*, 870 F.3d 939, 954-55 (9th Cir. 2017) (the allegations in the complaint itself

11   must give the defendant fair notice of what the plaintiff's claim is); *Pickern v. Pier 1 Imports,*

12   *Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (a party may not raise new claims in response to a

13   summary judgment motion)The Court does not find that recording an encounter, with no

14   disciplinary repercussions, constitutes adverse action in violation of the Constitution.

15   Finally, even if Plaintiff disagrees with the contents of the observation report, Plaintiff

16   has not shown Defendants Prieto and McCormick did not reasonably advance a legitimate

17   correctional goal in recording prisoner encounters in order to make a record of what they

18   considered problematic behavior. Defendants have submitted evidence Plaintiff was acting

19   aggressively, yelling, and ignoring staff instructions and that was the reason Defendants Prieto

20   and McCormick wrote the observation report. Though Plaintiff disputes that he was actually

21   yelling or acting aggressively, his perception of the encounter is not material to whether

22   Defendants reasonably advanced a legitimate correctional goal when they recorded their own

23   observations. The veracity of the observations is disputed, but the Court nonetheless finds

24

1   Defendants Prieto and McCormick advanced a legitimate penological interest in recording their

2   version of the interaction with Plaintiff. *See Caffrey v. Espino*¸1997 WL 205968, at *1 (9th Cir.

3   1997) (finding, although a prisoner disputed the veracity of observation and infraction reports,

4   the collection of observation and infraction reports regarding a prisoner's violation of the rules

5   furthered the legitimate penological goal of preserving institutional order).

6       Therefore, the Court finds Plaintiff has not shown Defendants Prieto and McCormick

7   retaliated against him when they asked him to sign the observation report. Accordingly, the

8   Court recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's fourth retaliation

9   claim.

10      *5.  Fifth Retaliation Claim*

11      Plaintiff claims Defendants Prieto and McCormick retaliated against him when they

12  infracted him and threatened to fire him from his job after he refused to sign the "Observation

13  Report". Dkt. 4-1, ¶ 52. He states his choice not to sign the observation report "is a freedom of

14  speech and protected conduct under these circumstances," and the "bogus" infraction report,

15  stating Plaintiff was yelling, was in retaliation for the failure to sign. *Id*.

16      a.  Evidence

17      Plaintiff states in his verified Complaint "McCormick and Prieto retaliated again by

18  writing an infraction." Dkt. 4-1, ¶ 36. He states Defendants Prieto and McCormick also retaliated

19  against him, in part, by forbidding Plaintiff from leaving the office until he signed the report. *Id*.

20  He also states part of the infraction was fabricated in that the infraction stated Plaintiff was

21  yelling, when Plaintiff was not in fact yelling. *Id*. He states the infraction "was in retaliation for

22  [Plaintiff] claiming to intend to and following through with a grievance; and for refusing to sign

23

24

1   the paper." *Id*. He states the "primary reason for writing the infraction is clear from the language

2   of the infraction itself where she[3] keeps repeating 'he still refused to sign.'" *Id*.

3        Plaintiff has submitted evidence in the form of his declaration, signed under penalty of

4   perjury, that he filed a "12-page grievance" on November 13, 2014, submitted it to Non-Party

5   McTarsney on that date, and Non-Party McTarsney confronted Defendants Prieto and

6   McCormick on that date. Dkt. 62, First McDaniels Decl., p. 52. He has not provided evidence,

7   other than his own testimony, to support this assertion.

8        The record reflects Plaintiff did file a 12-page grievance, signed on November 13, 2014.

9   Dkt. 51-1, pp. 2-14. The grievance includes, in part, a complaint Defendants Prieto and

10   McCormick retaliated against Plaintiff when they "fabricated an incident report which they coin

11   as an 'Observation Report.'" Dkt. 51-1, p. 8. The evidence indicates the grievance was received

12   on November 17, 2014, and a response was returned on November 18, 2014, requiring Plaintiff

13   to rewrite the grievance in accordance with the facility grievance policy. *Id*. at p. 2.

14        The record also indicates Defendant Prieto and Non-Party Jones filed an infraction report

15   for the November 13, 2014 incident. Dkt. 48-1, p. 10. The infraction was signed on November

16   17, 2014. *Id*. The infraction states Defendants Prieto and McCormick asked Plaintiff to come

17   back to their office in order to sign an observation report describing the incident during which

18   Defendants allegedly confronted Plaintiff about following rules regarding being escorted to the

19   clerk pool. *Id*. The infraction report explains after discussing the escort requirement with

20   Plaintiff, he "still refused to sign the report" because he did "not want to be written up." *Id*.

21   Defendants Prieto and McCormick explained he was not being written up because the

22

23

24

---

[3] Plaintiff's filings are unclear as to whether "she" is referring to Defendant Prieto or Defendant McCormick. [footnote by the Court]

observation report was not an infraction, but Plaintiff "refused signing the report again, was not listening to what was being said[,] and started arguing with both [Defendant Prieto] and [Defendant McCormick]." *Id*. The infraction states "[Plaintiff] was getting louder stating that if he was going to be written up then he was going to write us up [referring to Defendants Prieto and McCormick]." *Id*. "[Plaintiff] started yelling about wanting to Grieve [sic] the signing of the Observation Report and wanted to get the Chaplin [sic]." *Id*. When the chaplain was retrieved and the situation was explained, Plaintiff "kept interrupting the both of us very loudly and would not let either one of us finish what we were trying to tell him." *Id*. The infraction finally states, after Plaintiff refused again to sign the observation report and the chaplain signed for him, "[Plaintiff] was getting so overly argumentative and loud that [Defendant McCormick] instructed him to go back to his desk. During this incident the offender was argumentative, defiant[,] and yelling." *Id*.

Defendants' evidence indicates Defendant Prieto initially filed the infraction as a rule 103 general infraction for failing to follow a rule or policy. Dkt. 48, Prieto Decl., ¶ 18. Before officially submitting the infraction, Defendant Prieto sent the infraction to Defendant McCormick to review. Dkt. 48, Prieto Decl., ¶ 18; Dkt. 48-1, pp. 6-7. Non-Party Jones, upon reviewing the infraction, amended it to include a rule 353 infraction for engaging in disruptive behavior because he believed the 353 disruptive behavior infraction more accurately reflected the actions being infracted. Dkt. 52, Jones Decl., ¶ 4; Dkt. 48-1, p. 10. The infraction report also indicates Plaintiff pled not guilty to the infraction, stating "I don't have to sign that observation report." *Id*. After a hearing on November 20, 2014, Plaintiff was found guilty of the 353 infraction. Dkt. 48-1, p. 10.

1       Defendant Prieto has submitted testimony that she did not act in retaliation against

2   Plaintiff. Dkt. 48, Prieto Decl., ¶ 26. Rather, she states she believed "[Plaintiff's] screaming,

3   yelling, and being aggressive towards staff was a form of manipulation and a scare tactic," and

4   that was the reason for her actions. *Id*. Similarly, Defendant McCormick has submitted testimony

5   she did not retaliate against Plaintiff. Dkt. 53, McCormick Decl., ¶ 17. She states she answered

6   Plaintiff's questions regarding the grievance process, but "did not try to interfere with

7   [Plaintiff's] use of the grievance process or take any actions against [Plaintiff's] because of his

8   use of the grievance process." *Id*. She further states any adverse actions she took against Plaintiff

9   were because of Plaintiff's disruptive behavior, not because of anything else. *Id*.

10       b.   Analysis

11       Plaintiff has argued the fact that his refusal to sign the observation report was noted in the

12   infraction indicates it was, in fact, the substantial or motivating factor for the infraction. Initially,

13   Plaintiff has provided nothing showing a prisoner's refusal to sign an observation report is

14   protected speech under the First Amendment. *See*, *e.g.*, *Collins v. Williams*, 2012 WL 3262862,

15   at *6 n.1 (D. Nev. Aug. 8, 2012) (a prisoner failed to provide any precedent indicating the refusal

16   to sign a liability waiver was protected conduct under the First Amendment); *see also McGarvey*

17   *v. Borgan*, 2004 WL 11447822, at *2 (W.D. Wis. June 24, 2004) ("[I]t is not clear that [a

18   prisoner's] refusal to sign a waiver of work restrictions is protected speech under the First

19   Amendment"). Though the record indicates DOC policy upholds the right to refuse to sign

20   documents, the DOC's policy alone does not establish the right to refuse to sign an observation

21   report is protected speech under the First Amendment. *See* Dkt. 62, p. 93 (noting a prisoner has

22   the right under DOC policy not to sign documents).However, even assuming refusal to sign

23   documents is protected speech, Defendants have carried their burden on summary judgment.

24

1    The Court notes the observation report and Plaintiff's failure to sign it were mentioned in

2    Plaintiff's infraction report. However, the infraction report includes numerous other references to

3    Plaintiff's behavior and failure to follow staff instructions. It states Plaintiff was yelling,

4    argumentative, and continued to interrupt Defendants Prieto and McCormick throughout their

5    discussion when they requested that he sign the report. The infraction indicates Plaintiff was

6    being infracted for acting belligerently, interrupting staff, and failing to listen to instructions.

7    Thus, insofar as Plaintiff argues the infraction report was based wholly on his failure to sign the

8    observation report, the Court finds Plaintiff's argument unpersuasive. *See Harris*, 550 U.S. at

9    380 (when two parties tell two different versions, one of which is blatantly contradicted by the

10    record, the Court need not adopt that version of events).

11    Plaintiff disputes that he was actually acting with belligerence or improperly disobeying

12    any instructions from prison staff. However, Plaintiff was found guilty of the infraction and the

13    infraction itself states, though Plaintiff refused to sign the observation report, his violation was

14    not the refusal to sign, but in interrupting staff, failing to listen to instructions, as well as

15    becoming argumentative. Dkt. 48-1, p. 10. Further, though Plaintiff disagrees with Defendants

16    Prieto and McCormick's description of the incident, that disagreement alone does not bely the

17    fact the record indicates the infraction was written in response to Plaintiff's behavior toward

18    staff, not merely because he refused to sign an observation report. A disagreement about the

19    perception of an event is not sufficient in itself to mitigate Defendants' evidence. *See*, *e.g.*, *Baker

20    v. Walker*, 2011 WL 1239826, at *2 (E.D. Cal. March 29, 2011) (citing *Arpin v. Santa Clara

21    Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)) ("[Plaintiff's] mere disagreement,

22    without more, does not establish retaliation"). Even if the failure to sign the observation report

23    was part of the reason for the filing of the infraction, the Court finds, in light of the other

24

REPORT AND RECOMMENDATION - 27

1    evidence indicating Plaintiff was infracted for his belligerence, a reasonable juror could not come

2    to the conclusion that Plaintiff's failure to sign the observation report was the "substantial" or

3    "motivating" factor behind Plaintiff's infraction. *See Boles v. Billeci*, 2016 WL 3876647, at *6

4    (D. Ore. July 15, 2016) (a plaintiff's retaliatory evidence amounted only to timing and

5    defendants' knowledge of his criticism of racial discrimination, and a reasonable fact finder

6    could not infer retaliation was the "substantial or motivating" factor for defendants' actions

7    without more).

8        Therefore, the Court finds Plaintiff has failed to show Defendants Prieto and McCormick

9    retaliated against Plaintiff when they filed an infraction regarding his behavior. Accordingly, the

10   Court recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's fifth retaliation

11   claim.

12        *6.  Sixth Retaliation Claim*

13        Plaintiff claims Defendants Prieto, McCormick, and Bohon all retaliated against Plaintiff

14   when they terminated him from his clerk pool job because he "complained, spoke out, and

15   grieved the bogus infraction, refused to sign the bogus infraction, wrote grievances, and

16   complained in person about the bogus infraction, the restroom policy and being punished with a

17   filing cabinet at his back [in his work space]". Dkt. 4-1, ¶¶ 48-53.

18        a.  Evidence

19        The record indicates that, on March 1, 2012 (before the time of the allegations in the

20   Plaintiff's Complaint), Plaintiff's Incoming Transport Job Screening ("ITJS") noted that he had a

21   history of sexual violence, but approved him to work as a law library or chapel clerk. Dkt. 50-1,

22   pp. 18-19. It is undisputed that Plaintiff was working as a clerk in the clerk pool during the time

23

24

1    period from September 2013 to November 2014. *See* Dkt. 48-1, p. 15; Dkt. 53, McCormick

2    Decl., ¶ 3.

3         A new job screening for Plaintiff was initiated by Non-Party Ross on November 26,

4    2013. Dkt. 50-1, p. 8. Defendant Bohon approved and signed the job screening on January 13,

5    2014. *Id.* at p. 6. In the job screening, it was noted that Plaintiff had a history of sexual violence

6    against women. *Id.* at pp. 2, 4. The job screening stated Plaintiff's "prior criminal history is

7    sexually assaultive and he should be considered a risk to any female should the opportunity

8    present itself." *Id.* at p. 5. The job screening also indicated Plaintiff was no longer approved to

9    work either in the law library or the chapel. *Id.* His approved job placements were limited to

10   "Food Services," "Unit Porters," or "Recreation." *Id.* Plaintiff was already working as a clerk in

11   the clerk's pool at the time of the new job screening. *See* Dkt. 49, Atkinson Decl., ¶ 3-7; Dkt. 50,

12   Bohon Decl., ¶ 9.

13        Defendants' evidence indicates on November 25, 2014, Defendant Prieto was working in

14   the clerk pool alone when Plaintiff left the room without informing her. Dkt. 48, Prieto Decl., ¶

15   19. Because she was alone, she did not confront Plaintiff. *Id.* Later that morning, the chaplain

16   passed by Defendant Prieto's office and Defendant Prieto asked the chaplain to discuss

17   Plaintiff's behavior with him. *Id.* Plaintiff again left the clerk pool without informing Defendant

18   Prieto later that morning, and Defendant Prieto documented the second incident because she did

19   not believe the chaplain had yet spoken with Plaintiff. *Id.*; Dkt. 48-1, p. 20. Plaintiff sent the

20   documentation to Non-Party Ross and Non-Party Johansen for input. Dkt. 48-1, pp. 17, 19-20.

21        The evidence submitted by Defendants indicates after Non-Party Ross received

22   Defendant Prieto's email, she looked into Plaintiff's background and discovered Defendant

23   Bohon's January 13, 2014 job screening, which concluded Plaintiff was not approved for work in

24

1    the clerk pool. Dkt. 49, Atkinson Decl., ¶ 7. Non-Party Ross forwarded the information to Non-

2    Party Brule and Non-Party Jones, indicating she wanted Plaintiff terminated from his position.

3    *Id*.; Dkt. 49-1, p. 6. The evidence indicates Non-Party Ross recommended his termination on

4    November 25, 2014 because "[h]is argumentative behavior is escalating to where he is yelling at

5    staff and seems to walk around anywhere he wants when he is in T building [sic]." Dkt. 49-1, p.

6    6. She included a summary of Defendant Bohon's job screening, indicating Plaintiff's "prior

7    criminal history is sexually assaultive and he should be considered a risk to any female should

8    the opportunity present itself." *Id*. at pp 6-7. She also included a copy of a previous entry in

9    OMNI,[4] describing the encounters on November 13, 2014 and November 14, 2014, in which

10   Plaintiff was allegedly belligerent to Defendants Prieto and McCormick. *Id*. Non-Party Ross also

11   informed Defendant Prieto she would forward Defendant Prieto's concerns to her supervisor. *Id*.

12   at p. 2. Non-Party Ross forwarded additional documentation to her supervisor regarding

13   Plaintiff's behavior, including Defendant McCormick's November 13, 2014 incident report,

14   Defendant Prieto's infraction report, and Defendant Prieto's observation report. *See* Dkt. 49,

15   Atkinson Decl., ¶ 9; Dkt. 49-1, pp. 10-15.

16         Non-Party Jones then replied to Non-Party Ross's email, indicating she should "[d]rop

17   [Plaintiff] immediately as he is not authorized to work in that area." Dkt. 49-1, p. 6. Non-Party

18   Ross indicated she would inform Plaintiff he had been dropped from the clerk pool, but

19   Defendant Prieto explained "[Defendant] Bohon already talked to him. He feels that it is

20   retaliation." *Id*. at p. 5.

21

22   _____

23         [4] "OMNI" is the Offender Management Network Information database, a DOC database containing
     information on prisoners in DOC custody, including sentence structure, criminal conviction records, and pre-
24   sentence investigation. Dkt. 50, Bohon Decl., ¶ 6.

1         Plaintiff has stated in his verified Complaint he was called to speak with Defendant

2   Bohon and Defendant Prieto on November 25, 2014. Dkt. 4-1, ¶ 37. Plaintiff states Defendant

3   Bohon indicated Plaintiff was going to be dropped from his job in the clerk's pool. *Id*. Plaintiff

4   states Defendant Bohon indicated he was not being "fired," but he said "'you, [. . . hesitated in

5   his loss for words . . .] you just can't work here any more [sic].' 'You never should have been

6   hired in the first place.'" *Id*. (first brackets in original). Plaintiff states Defendant Bohon

7   indicated during the discussion his termination was based on his criminal history, but Plaintiff

8   argues "his motive was retail[a]tory due to [Plaintiff's] grievances." *Id*. at ¶ 38. Plaintiff states he

9   informed Defendant Bohon there were numerous other prisoners in the clerk pool with worse

10  criminal histories than Plaintiff. *Id*. He further states Defendant Bohon "made his final decision .

11  . . to terminate [Plaintiff] after receiving [his] infraction appeal earlier that day." *Id*. Plaintiff

12  states he informed Defendant Bohon there are numerous sex offenders and murderers in the clerk

13  pool, but his "current conviction is Burglary II, a class B Felony," and Defendant Bohon "was in

14  complete shock" when he was informed.  *Id*. at ¶ 40.[5]

15        Plaintiff also states when he mentioned the infraction Defendant Prieto had written

16  against Plaintiff, Defendant Prieto stated she had "never heard about any grievance." Dkt. 62,

17  First McDaniels Decl., p. 2. Plaintiff emphasizes that, though Defendant Prieto mentioned a

18  "grievance," he had never mentioned any "grievance" to her, and so this is evidence supporting

19

20

21  _____

22     [5] The Court notes Plaintiff accurately represents he is currently serving a sentence for several counts of
    burglary in the second degree. *See* Dkt. 50-1, p. 2. However, the Court also notes the record includes a notation in

23  Plaintiff's OMNI file indicating the burglary charge was a result of a plea deal to avoid a third strike charge for a
    sexually violent crime. *See id*. at p. 3. The Court includes this observation because Plaintiff argues, in part, that he
    was unlawfully terminated while other similarly situated prisoners, including prisoners convicted of rape and

24  murder, were not. *See* Dkt. 4-1, ¶¶ 39-40, 54.

1    the allegation Defendant Prieto knew about Plaintiff's grievance when she allegedly made the

2    determination to drop Plaintiff from the clerk pool. *Id.*

3        Defendants' evidence corroborates the fact Plaintiff was informed he was going to be

4    dropped from his job on November 25, 2014. The record indicates Defendants Prieto and Bohon

5    explained to Plaintiff he was being dropped from the clerk pool because of his behavioral issues

6    and because of his previous January 13, 2014 job screening. Dkt. 50, Bohon Decl., ¶ 11.

7    Defendant Bohon states he recalls Plaintiff referring to the crimes of other prisoners in the clerk

8    pool, but that Defendant Bohon redirected the conversation, informing Plaintiff "we were talking

9    about him, not about other inmates." *Id.* The record indicates Defendant Bohon did not realize

10   Plaintiff was already working in the clerk pool when he signed Plaintiff's initial job screening.

11   Dkt. 49-1, p. 17.

12       On November 25, 2014, Plaintiff filed a kite, indicating he understood his termination

13   would be processed by the Facility Risk Management Team ("FRMT"), asking that his kite be

14   considered an appeal to Defendants' decision to terminate him, and requesting that his callout for

15   the FRMT be processed quickly. Dkt. 50-1, p. 26. In a response dated December 2, 2014,

16   Defendant Bohon stated that he did not realize Plaintiff was already working in the clerk's pool

17   when Defendant Bohon reviewed Plaintiff's January 2014 job screening, and did not realize

18   Plaintiff had been approved for work in the clerk's pool in March 2012. *Id.* He also stated he

19   "told [the] FRMT not to consider [Defendant Bohon's] Jan '14 error in [Plaintiff's] upcoming

20   Review, and [he had] directed them to initiate a new job screening for [him] to review." *Id.*

21       On December 2, 2014, Defendant McCormick sent Non-Party Ross a copy of Plaintiff's

22   contract he had signed when he started at the clerk pool, including requirements to be respectful

23   to staff and obey staff instructions. Dkt. 50-1, p. 23. Non-Party Ross reviewed the contract and

24

REPORT AND RECOMMENDATION - 32

1    asked Defendant Bohon if violation of the contract would be sufficient for the FRMT to

2    terminate Plaintiff. *Id.* Defendant Bohon indicated he thought the best course of action would be

3    to give Plaintiff a new contract and more particularly spell out his expectations, but, "if the

4    FRMT wants to terminate [Plaintiff], that's the FRMT's decision." *Id.* at p. 22. Non-Party Ross

5    then indicated she was going to request termination from the FRMT. *Id.*

6         The record indicates on December 4, 2014, Non-Party Ross sent an email to Defendant

7    Prieto indicating Plaintiff's position had been reviewed by the FRMT and the FRMT had made a

8    determination, terminating Plaintiff from his position. Dkt. 49-1, p. 36. The email indicates none

9    of the Defendants were part of the FRMT. Dkt. 49-1, p. 36. The record indicates the FRMT

10   examined the "infraction for WAC 353 Disruptive Behavior on 11/13/14, Offender Clerk Pool

11   Agreement signed by Offender McDaniel's [sic] on 9/16/13, Incident report on 1/13/14 from

12   clerk pool Supervisor Marcia McCormick, Observation Report (DOC 21-021) dated 11/13/14,

13   [and] staff statements from OAS Prieto dated 11/25/14 and 11/14/14." *Id.* The email indicates the

14   "FRMT concurs that all the documentation indicates that [Plaintiff] is in violation of the

15   Offender Clerk Pool Agreement signed by [Plaintiff] on 9/16/13. FRMT Recommends

16   Termination [sic] of [Plaintiff] from the Clerk 1 position due to infraction behavior and

17   disrespectful behavior towards staff." *Id.*[6] The record also indicates Plaintiff was provided fifteen

18   minutes to present his version of the events in question before the FRMT made its decision. *Id.*

19   The record reflects Plaintiff was officially terminated from his position on December 10, 2014.

20   Dkt. 52-1, p. 10.

21

22   _____

23        [6] The record includes copies of the incident report, observation report, infraction report, and clerk pool
     agreement referenced by the FRMT. *See* Dkt. 53-1, p. 2 (clerk pool agreement); Dkt. 53-1, p. 8 (incident report);
     Dkt. 53-1, p. 15 (observation report); Dkt. 48-1, pp. 6-7, 10 (infraction report); *see also* Dkt. 53-1, p. 6 (OMNI entry

24   by Defendant McCormick describing Plaintiff's behavior on November 13, 2014, and November 14, 2014).

1    On January 29, 2015, Plaintiff sent a kite to Defendant Bohon, asking about whether he

2    had been previously approved for the clerk pool. Dkt. 50-1, p. 30. Defendant Bohon responded,

3    stating Plaintiff had been previously approved, but his January 2014 job screening did not

4    approve him for work in the clerk pool. *Id*. However, Defendant Bohon also noted that, since his

5    termination, Plaintif had "since been rescreened and denied [for the clerk pool] based on the

6    behaviors [he] exhibited while [he] worked in there combined with [his] criminal history." *Id*. In

7    response to a second kite, filed on February 27, 2015, Defendant Bohon clarified that the

8    decision to drop Plaintiff was based both on Plaintiff's job screening, but also on Plaintiff's

9    behavior toward staff. *Id*. at p. 32.

10    Plaintiff has also included allegations unrelated to this case, stating that, when Defendant

11    Bohon interviewed Plaintiff regarding a later grievance, he eventually "dipped his head and said,

12    'This (accent) [sic] is what you should be pursuing." Dkt. 4-1, ¶ 44.

13    b.    Analysis

14    Here, the Court finds Plaintiff has not shown he was terminated in retaliation for filing a

15    grievance or otherwise complaining about his prison job. Initially, Plaintiff has provided no

16    direct evidence that his complaints about his job led to Defendants retaliating against him by

17    terminating Plaintiff from his position. Rather, he appears to rely on circumstantial evidence and

18    allegedly suspect timing. He argues he complained to Defendants about the conditions at his job.

19    Read in the light most favorable to Plaintiff, the record reflects that, after failing to notice

20    that Plaintiff was accompanied by an officer, Defendants Prieto and McCormick confronted

21    Plaintiff regarding his failure to follow staff instructions – a failure Plaintiff denies. Defendants

22    Prieto and McCormick later generated an observation report indicating Plaintiff had not followed

23    staff instructions, a description Plaintiff also disagrees with. Plaintiff filed a grievance addressing

24

the observation report, and Defendant Prieto issued an infraction for failing to obey staff

instructions based on the interaction surrounding the observation report. On November 25, 2014,

after all this had occurred, Non-Party Ross sent an email indicating Plaintiff should be dropped

from his job based on Defendant Bohon's January 13, 2014 job screening and based on

Plaintiff's recent behavior. Non-Party Brule concurred with the decision to drop Plaintiff from

the clerk pool, and Non-Party Jones issued the directive on November 25, 2014 to have Plaintiff

dropped. After Defendant Prieto and Defendant Bohon informed Plaintiff he was being dropped

from the clerk pool, his case was referred to the FRMT for consideration as to whether he should

be officially terminated. The record reflects the FRMT ultimately determined Plaintiff should be

dropped from the clerk pool because Plaintiff had violated the clerk pool agreement, and because

of Plaintiff's infraction history and disrespect towards staff. Plaintiff was officially terminated

from his position on December 10, 2014.

Plaintiff argues the timing of these incidents shows Defendants were actually motivated,

not by any of his allegedly belligerent behavior, but by his decision to complain about his

working environment and file grievances regarding several Defendants' behavior. However,

Plaintiff has not included any statements from any Defendants stating that they were motivated

by Plaintiff's grievances. *See*, *e.g.*, *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) (noting a

prisoner adequately showed causation when he included testimony explaining how Defendants

described their motivations). Rather, he relies on timing and his own speculation. Though timing

is circumstantial evidence the Court may consider, speculation and timing alone are not enough

to raise a triable issue of material fact. *See James v. Emmens*, 2018 WL 4002644, at *10-*11

(S.D. Cal. Aug. 22, 2018) (finding reliance on timing and speculation contained in a self-serving

1    declaration was insufficient to show knowledge of the filing of a grievance or lack of a legitimate

2    penological purpose).

3         Further, Defendants have provided evidence Plaintiff's termination reasonably advanced

4    a legitimate correctional goal, and Plaintiff has only provided conclusory allegations to the

5    contrary. Defendants' evidence demonstrates Plaintiff was terminated, not because he had filed a

6    grievance, but because he was not obeying staff instructions, he had acquired an infraction in

7    violation of the agreement he signed when he became a clerk, and there was a job screening on

8    the record that precluded him from working in the clerk pool. Though Plaintiff alleges

9    Defendants should have noticed his job screening sooner, and though he alleges the job

10   screening was used as a ruse to terminate him, Plaintiff has only included evidence based on his

11   own speculation. *See* Dkt. 4-1.  In contrast, Defendants have submitted actual evidence the job

12   screening took place, Plaintiff was already in the clerk pool job, Defendant Bohon was unaware

13   Plaintiff was in the clerk pool, and it was not standard at the time of Plaintiff's job screening to

14   look into whether a prisoner was currently employed when the job screening is processed. *See*

15   Dkt. 50, ¶ 9.

16        Plaintiff states he was "terminated by defendants, [sic] Bohon and Prieto in a poorly

17   planned conspiracy, due to his grievances." Dkt. 63, p. 9. He states "Bohon terminated the

18   plaintiff with unlawful motive," citing to his Declaration that states "Defendant, Gary Bohon,

19   terminated [Plaintiff] from the Clerk Pool with unlawful motive, and then once I called his bluff

20   on his 'criminal history' story, he conspired with the defendants Prieto and McCormick, and co-

21   conspirators Jones, Brule, and Ross to make a mock FRMT to cover it up." Dkt. 63, p. 13 (citing

22   Dkt. 62, First McDaniels Decl., p. 59). Plaintiff has also alleged Defendants' assertion they did

23   not know Plaintiff was in the clerk pool even after his job screening precluded him from working

24

there is false. He states the job screening "was a malicious act instigated by plaintiff's counselor who was zealously attempting to get him removed from his programs," and "the objective proof shows that [Non-Party Ross] knew very well that [Plaintiff] was working as a Clerk Pool worker," citing to his First Declaration as a whole. Dkt. 63, p. 13. Plaintiff does not include any particular citations or reference any specific evidence to support this assertion.

Here, Plaintiff has provided a host of allegations that Defendants conduct was retaliatory, but he has not pointed to evidence on the record to support that assertion. Allegations a defendant's conduct was retaliatory, without more, is not enough to support Plaintiff's burden. *See Holmberg v. Dep't of Corr. of Wash.*, 2016 WL 7383871, at *6-*7 (W.D. Wash. Nov. 22, 2016) *report and recommendation adopted*, 2016 WL 7375597 (finding Defendants had provided evidence negating an essential element of Plaintiff's claim, and Plaintiff had failed to rebut Defendants' evidence); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (as the nonmoving party, Plaintiff "must do more than simply deny the veracity of everything offered").

Further, Defendants argue none of the named Defendants were actually responsible for Plaintiff being terminated from the clerk pool. Dkt. 47, p. 20. The record indicates that on November 25, 2014, after receiving complaints from Defendant Prieto, Non-Party Ross sent an email indicating she believed Plaintiff should be terminated from the clerk pool based on both his job screening and his recent behavior toward staff. Non-Party Jones and Non-Party Brule agreed with Non-Party Ross, and Non-Party Jones directed that Plaintiff be dropped from the clerk pool. The record also indicates the FRMT met and made a determination that Plaintiff should be officially terminated on or around December 4, 2014. No Defendants were part of the FRMT. The document officially terminating Plaintiff from his position was signed on December

10, 2014 by Non-Party Jones. Thus, insofar as Plaintiff alleges Defendant Prieto, Defendant McCormick, and Defendant Bohon were the ultimate decision-makers who terminated Plaintiff from the clerk pool, the record blatantly contradicts Plaintiff's assertions. *See Harris*, 550 U.S. at 380 (the Court need not adopt a version of facts when one version is so blatantly contradicted by the record such that a reasonable juror would not believe it).

Plaintiff also argues Defendants Bohon and Prieto initially told Plaintiff he was being terminated due to his criminal history, but later, "once they realized they could not use that story due to the overwhelming criminal histories from numerous of the plaintiff's co-workers," they changed their version of events to terminate him based on his behavior. *See* Dkt. 63, p. 9. The Court finds this argument unpersuasive. The record before the Court indicates Defendant Prieto and McCormick had documented Plaintiff's alleged behavior before he was dropped from the clerk pool. Further, the record indicates that the FRMT used both the job screening, criminal history, and Plaintiff's behavior when it came to its decision to officially terminate Plaintiff. Insofar as Plaintiff argues the Defendants changed their version of events because they "could not use" his job screening and criminal history, the record belies Plaintiff's argument.

Thus, the Court concludes Plaintiff has not provided evidence such that a reasonable juror could conclude that retaliation for Plaintiff's grievance was the "substantial" or "motivating" factor behind Plaintiff's ultimate termination from the clerk pool. Therefore, the Court finds Plaintiff has not shown Defendants retaliated against Plaintiff when he was terminated from the clerk pool. Accordingly, the Court recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's sixth retaliation claim.

B. <u>Equal Protection</u>

1    Plaintiff also claims his equal protection rights were violated when he was terminated

2  from his position allegedly because of his criminal history, while other prisoners with more

3  egregious histories were allowed to keep their positions, and when the bathroom policy was

4  allegedly unequally implemented against him. The Fourteenth Amendment's Equal Protection

5  Clause "is essentially a direction that all persons similarly situated should be treated alike." *City

6  of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). To

7  bring a successful equal protection claim, a plaintiff must show differential treatment from a

8  similarly situated class. *See Washington v. Davis*, 426 U.S. 229, 239 (1976). For this differential

9  treatment to give rise to a claim under § 1983, "one must show intentional or purposeful

10  discrimination." *Draper v. Rhay*, 315 F.2d 193, 198 (9th Cir. 1963) (inmate failed to show §

11  1983 violation in absence of "intentional or purposeful discrimination"). A successful equal

12  protection claim may be brought by a "class of one," when the plaintiff alleges he has been

13  intentionally treated differently from others similarly situated and there is no rational basis for

14  the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Hence,

15  for Plaintiff to prevail on an Equal Protection Clause claim, Plaintiff must not only show

16  differential treatment by Defendant, but also that Defendant intentionally or purposefully

17  discriminated against him. *Draper*, 315 F.2d at 198.

18    Plaintiff claims his equal protection rights were violated because he was allegedly

19  terminated based on his criminal history, but other inmates who had even more egregious

20  criminal histories were allowed to retain their jobs. Dkt. 4-1, ¶ 54. He states "similarly situated

21  inmates were not terminated due to their criminal history, and [Plaintiff is] challenging that

22  without waiving [his] claim that the criminal history 'story' is in and of itself bogus, meritless,

23  and not the reason [he] was terminated." *Id*. He states he was discriminated against, "and

24

1  [Defendant] Bohon's excuse for [his] job termination was merely a pretext for a very

2  impermissible motive." *Id*. at ¶ 46. He states "[o]ther similarly situated inmates (and higher

3  custody level inmates) were not terminated under that same pretext even when one of them

4  openly threatened [Defendant] Prieto's predecessor by say what means [sic], 'you don't know

5  what I am capable of' as he charged at her." *Id*. He also states there was a "shower killer" who

6  was allowed to keep his job even though Plaintiff was terminated, and states "[t]he timeline of

7  this retaliation spree is remarkable." *Id*. Finally, he states the bathroom policy was unequally

8  applied to him in "violation of the EQUAL OPPORTUNITY clause." *Id*. at ¶ 49.

9          Plaintiff has submitted evidence he is currently serving a sentence for four counts of

10  burglary in the second degree. Dkt. 62, First McDaniels Decl., p. 115.[7] Plaintiff has also

11  submitted evidence indicating other prisoners working in the clerk pool at the same time as

12  Plaintiff had felony convictions. Plaintiff's evidence indicates other prisoners in the clerk pool

13  were serving sentences for, among other crimes, rape in the first degree, attempted rape of a

14  child, murder in both the first and second degrees, attempted murder, and assault in the first

15  degree. Dkt. 62, First McDaniels Decl., 116-27. Plaintiff's verified Complaint contains

16  statements he was terminated from his job, in part, based on his past criminal history and his job

17  screening, but those other prisoners with similar or worse criminal convictions were not

18  terminated. *See* Dkt. 4-1, ¶ 46.

19

20

21  _____

22          [7] The Court again notes Plaintiff accurately represents he is currently serving a sentence for burglary in the
    second degree. *See* Dkt. 50-1, p. 2. However, the Court also notes the record includes a notation in Plaintiff's OMNI

23  file indicating the burglary charge was a result of a plea deal to avoid a third strike charge for a sexually violent
    crime. *See id*. at p. 3. The Court includes this observation because Plaintiff argues, in part, that he was unlawfully

24  terminated while other similarly situated prisoners, including prisoners convicted of rape and murder, were not. *See*
    Dkt. 4-1, ¶¶ 39-40, 54.

1    Defendants have submitted evidence that each job screening is unique and no two job

2  screenings are identical. Dkt. 50, Bohon Decl., ¶¶ 6, 18. Defendants' evidence indicates, though

3  other prisoners with criminal histories may have been allowed to maintain jobs in the clerk pool,

4  the job screening that caused Plaintiff to be dropped from the clerk pool was a unique,

5  individualized process that is not comparable to other prisoners. *Id*. Defendants' evidence

6  indicates, rather than precluding prisoners with a particular criminal conviction from working in

7  the clerk pool, the job screening process takes multiple different aspects of each prisoner into

8  account, including the conviction for which a prisoner is serving a sentence as well as various

9  other factors, including but not limited to: "History of predatory violence," "History of predatory

10  sexual violence," "Mental health concerns," and "The ITJS Summary Narrative." *Id*. at ¶ 6.

11  Defendants have also provided evidence that both prisoners and staff were required to adhere to

12  security measures regarding their movement in order to maintain facility control and security and

13  ensure all prisoners and staff were accounted for at all times. Dkt. 48, Prieto Decl, ¶ 9.

14    Plaintiff alleges he was discriminated against because he was terminated from his clerk

15  pool job, but other prisoners who had similar or more egregious criminal convictions were

16  allowed to retain their jobs in the clerk pool. However, Plaintiff has not established that he is a

17  member of a protected class or that he was treated differently from others similarly situated.

18    Initially, Plaintiff does not allege he is in a protected class, but instead brings his

19  allegations as a "class of one" who was treated differently from others similarly situated. *See*

20  Dkt. 4-1, ¶ 54. Plaintiff notes several other prisoners who have been convicted of felonies were

21  allowed to retain their jobs in the clerk pool after Plaintiff was terminated. *See* Dkt. 4-1, ¶ 54;

22  Dkt. 62, First McDaniels Decl., pp. 116-27. However, assuming those prisoners were employed

23  in the clerk pool and allowed to retain their jobs, those prisoners are not similarly situated to

24

1    petitioner. It is true that each of the individuals identified by Plaintiff are prisoners and each of

2    them have been convicted of some criminal conduct. However, none of the prisoners Plaintiff

3    identifies were convicted of the same crime as Plaintiff. *See* Dkt. 62, Second McDaniels Decl.,

4    pp. 115-27 (noting Plaintiff was convicted of burglary, but noting the other prisoners were

5    convicted of different crimes). Further, Plaintiff's January 2014 job screening indicated he would

6    be a danger to female staff, and cautioned against placing him in a job where he would be

7    working closely with female staff. The record also indicates Defendants catalogued alleged

8    behavioral problems Plaintiff engaged in. Plaintiff has not provided evidence that there were

9    other prisoners who had similar notations included in their job screenings, or that there were

10   other prisoners with backgrounds and behavior similar to Plaintiff who were allowed to keep

11   their jobs. Indeed, Defendants have provided evidence each job screening is individualized and

12   each prisoner evaluated for job placement on a case-by-case basis. Dkt. 50, Bohon Decl., ¶¶ 6,

13   18. Because the evidence does not show there were prisoners with the same concerns as Plaintiff

14   and with a similar background to Plaintiff who were treated differently than Plaintiff, the Court

15   finds Plaintiff has not adequately shown he was treated differently from others similarly situated.

16   *See Garcia v. Smith*, 2013 WL 12108668, at *9 (S.D. Cal. Aug. 21, 2013) (finding the

17   submission of a list of other prisoners who allegedly worked in a job from which a prisoner was

18   terminated does not establish the prisoner was treated differently).

19        In addition, Plaintiff has not provided evidence any prison policies were unequally

20   enforced against him. Plaintiff has stated the bathroom policy and its enforcement against him

21   was a violation of the "EQUAL OPPORTUNITY clause." Dkt. 4-1, ¶ 49. However, even taking

22   this as an allegation Plaintiff's rights under the equal protection clause were violated, Plaintiff

23   has only included his own assertions stating that his equal protection rights were violated by the

24

1   bathroom policy. He has not provided any evidence other than those assertions that he was

2   treated differently from other prisoners, and Defendants have provided evidence all prisoners

3   were held to same set of rules requiring them to inform Defendants Prieto or McCormick when

4   they left the clerk pool area. *See* Dkt. 48, Prieto Decl., ¶¶ 8-9, 12-13, 15.  Bare allegations, even

5   in a verified complaint, are insufficient to survive a motion for summary judgment. *See Clewis v.*

6   *California Prison Health Care Service*, 2013 WL 2482521, at *7 (E.D. Cal. June 10, 2013)

7   (finding "[b]are allegations, formulated at a high level of generality, are insufficient to meet

8   plaintiff's burden on summary judgment"); *see also Rizzo*, 778 F.2d at 532, n.4; *Leer v. Murphy*,

9   844 F.2d 628, 634 (9th Cir. 1988).

10          Therefore, the Court finds Plaintiff has not shown he was treated differently from others

11   similarly situated when he was terminated from the clerk pool position. Accordingly, the Court

12   recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's equal protection claim.

13          C.   Claims Pursuant to 42 U.S.C. § 1985 and § 1986.

14          Plaintiff also makes allegations against Defendants based on 42 U.S.C. § 1985 and §

15   1986. In relevant part, § 1985(3) prohibits "two or more persons" from "depriving, either directly

16   or indirectly, any person or class of persons of the equal protection of the laws, or of equal

17   privileges and immunities under the laws." 42 U.S.C. § 1985(3). A claim under § 1985(3)

18   requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus

19   behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also RK*

20   *Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 (9th Cir. 2002). Moreover, the mere

21   allegation of conspiracy without supporting facts is insufficient to state a claim under § 1985.

22

23

24

*Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 625 (9th Cir. 1988). A claim under § 1986 can only succeed if a plaintiff has shown a valid § 1985 claim. *Id*. at 626.

Here, the Court has already made a determination that Plaintiff has not shown his constitutional rights were violated. As such, Plaintiff has failed to show any Defendants deprived him of his equal protections under the law. Further, Plaintiff has not shown any alleged constitutional violation was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" as required by § 1985. Thus, Plaintiff has not shown his rights under § 1985 were violated, and consequently cannot show he can recover under either § 1985 or § 1986.

Therefore, Plaintiff has failed to show he may recover pursuant to § 1985 or § 1986. Accordingly, the Court recommends Defendants' Motion (Dkt. 47) be granted as to Plaintiff's § 1985 and § 1986 claims.

D. Qualified Immunity

The Court has already made a determination as to Plaintiff's claims on the merits. Therefore, the Court declines to make a determination as to qualified immunity at this time.

**IV.    Conclusion**

For the reasons stated herein, the Court concludes Plaintiff has failed to show any of his constitutional rights were violated. Accordingly, the Court recommends Defendants' Motion (Dkt. 47) be granted and Plaintiff's action be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

1   imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

2   March 29, 2019, as noted in the caption.

3

4        Dated this 11th day of March, 2019.

5

6        _____

7        David W. Christel
         United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24